# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                            No. CR 08-2344 JB

YURAN ARANDA-DIAZ,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress Evidence and Supporting Memorandum, filed January 5, 2009 (Doc. 27). The Court held a hearing on March 31, 2009. The primary issue is whether the Court should suppress all physical evidence, including cocaine, money, and a handgun, derived from the Albuquerque police officers' stop and subsequent search of Defendant Yuran Aranda-Diaz' vehicle. The resolution of that question turns on two sub-issues. Those sub-issues are: (i) whether the initial stop to which Aranda-Diaz was subject was unlawful; and (ii) whether search of the vehicle was unlawful. The Court finds that the initial stop, which was based on an observed traffic violation, was lawful. Moreover, because, in the course of the stop, the totality of the circumstances gave rise to probable cause that Aranda-Diaz was committing a crime, the search and seizure of evidence from Aranda-Diaz' person and from the interior of the vehicle were constitutionally valid. Because the search and seizure were lawful at all stages, the Court will not suppress the evidence that is the fruit of that search.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. The findings of fact in

this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search.  See United States v. Merritt, 695 F.2d 1263 (10th Cir. 1982), cert. denied, 461 U.S. 916 (1983).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 1101(d)(1).  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269.

1.      Albuquerque Police Detective Edwin Linson is an experienced narcotics officer.  See Transcript of Suppression Hearing at 4:20-5:1 (taken March 31, 2009)("Tr.")(Cairns, Linson);[1] id. at 11:1-2 (Linson, Cairns).

2.      At times, Linson works undercover.  See Tr. at 5:6-7 (Cairns, Linson).

3.      In his experience as a narcotics officer, Linson has observed that individuals involved in the sale of narcotics frequently carry weapons.  See Tr. at 27:8-11 (Cairns, Linson).

4.      On July 23, 2008, at approximately 9:20 p.m., Linson was working undercover in an area near 12th Street and Candelaria in Albuquerque, New Mexico.  See Tr. at 5:12-16 (Cairns, Linson); id. at 6:10-11 (Linson); id. at 28:19 (Linson).

5.      Because he was working undercover, Linson was in a car that bore no markings or features that would have identified him as a police officer.  See Tr. at 11:12-15 (Cairns, Linson).

6.      Because he was undercover, Linson was dressed in blue jeans, tennis shoes, and a

_____

[1] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

long-sleeve dark T-shirt.  See Tr. at 11:16-18 (Cairns, Linson).

7.     Linson observed three vehicles parked outside of a Johns Brooks food market.  See Tr. at 5:18-22 (Linson); id. at 6:17-20 (Linson).

8.     Linson observed that it was dark, and that the three vehicles were parked closely together on the unlit side of the store.  See Tr. at 6:17-7:5 (Linson).

9.     During the time Linson was observing them, none of the individuals in the three vehicles entered the grocery store.  See Tr. at 7:14-15 (Linson).

10.     Linson observed Aranda-Diaz get out of one of the vehicles – a tan sport-utility vehicle ("SUV").  See Tr. at 10:1-10 (Linson).

11.     Linson observed that Aranda-Diaz was wearing a white muscle shirt or "wife-beater." Tr. at 29:25-30:1 (Linson).

12.     Linson observed Aranda-Diaz run back and forth between the vehicles in the parking lot several time exchanging items by hand with the people in the other vehicles.  See Tr. at 30:16-19 (Linson).[2]

13.     During these observed transactions, Linson observed Aranda-Diaz reach into a sock

_____

[2] Aranda-Diaz disputes in his brief and arguments that he was running between the other cars making hand-to-hand transactions.  Because he did not put on evidence to challenge Linson's assertion, and because he  did not raise any serious questions regarding Linson's credibility, the Court finds that Linson is accurately recounting what he observed in the John Brooks parking lot. Linson told a coherent story and was willing to honestly testify about matters that would not necessarily work in the United States' favor.  For example, Linson admitted that he did not regularly give out traffic citations and that he was following Aranda-Diaz, not because he wanted to enforce traffic laws, but because he was suspicious that Aranda-Diaz might have been involved in narcotics activity.  See Tr. at 34:1-11 (Gandert, Linson); id. at 32:19-33:5 (Linson).  Given that Linson did not appear to be aggressively defending his own actions, and given that both his story and his courtroom demeanor suggest that he was being truthful, the Court will credit his testimony and find that he accurately observed Aranda-Diaz making trips back and forth between the other cars in the John Brooks parking lot, and carrying out hand-to-hand transactions.

and retrieve an item from the sock.  See Tr. at 12:14-21 (Linson).

14.     Based on his training, experience, and his observations of the activities in the John

Brooks parking lot, Linson suspected that the people in the parking lot were exchanging drugs or

some other form of contraband for money.  See Tr. at 11:6-9 (Linson).

15.     After watching the three vehicles for approximately five to eight minutes, Linson

observed Aranda-Diaz getting into the tan SUV and leaving the parking lot of the John Brooks store.

See Tr. at 13:3-20 (Cairns, Linson); id. at 31:18-24 (Gandert, Linson).

16.     Aranda-Diaz drove south from the food store on 12th Street toward Menaul

Boulevard in Albuquerque.  See Tr. at 13:17-18 (Linson); id. at 31:24-25 (Gandert, Linson).

17.     Because Linson believed Aranda-Diaz had engaged in suspicious behavior, Linson

followed Arnada-Diaz' SUV with the objective of continuing his investigation.  See Tr. at 14:14-21

(Linson); id. at 32:19-33:5 (Linson).

18.     As Aranda-Diaz approached the intersection of 12th Street and Menual, Linson

observed Aranda-Diaz drive, without stopping, through the red light at the intersection and proceed

westbound on Menaul.  See Tr. at 15:20-24 (Linson).

19.     The City of Albuquerque's traffic code states:

Whenever traffic is controlled by traffic control signals exhibiting colored lights or
colored lighted arrows, successively one at a time, or in combination, only the colors
green, yellow and red shall be used, except for special pedestrians control signals
carrying a word legend and the lights indicate and apply to drivers of vehicles and
pedestrians.

* * * *

(E)     Steady Red.

(1) Vehicular traffic facing the signal shall stop before entering the
crosswalk, on the near side of the intersection, or if there is no
crosswalk, then before entering the intersection shall remain standing

-4-

> until green is shown.  However, if there is no sign prohibiting a right
> turn on a red light, such vehicle may turn right into the nearest right
> lane as practicable after standing until the intersection may be entered
> safely, provided that such vehicle shall yield the right-of-way to all
> pedestrians, bicycles and other vehicles lawfully in or approaching
> the intersection.

City of Albuquerque Traffic Code § 8-2-2-2.

20.     Linson observed Aranda-Diaz commit a vehicular violation.  See Tr. at 16:11-13(Cairns, Linson).

21.     Linson is authorized to enforce the City of Albuquerque's traffic code.  See Tr. at 5:2-5 (Cairns, Linson)

22.     Linson informed another Albuquerque Police Department officer, Detective Landarazo, that Aranda-Diaz had driven through the red light at the intersection.  See Tr. at 16:20-22 (Linson); id. at 14:12-21(Linson).

23.     After radioing Landarazo, Linson followed Aranda-Diaz' SUV from a distance while waiting for Landarazo to arrive.  See Tr. at 16:24-17:2 (Linson).

24.     Landarazo arrived and drove behind Aranda-Diaz' SUV.  See Tr. at 17:24-18:2 (Linson).

25.     Landarazo engaged the emergency lights and siren on his police car.  See id. at 17:5-7 (Linson).

26.     The SUV driven by Aranda-Diaz did not stop immediately in response to the police car's flashing lights and siren.   See Tr. at 17:8-12 (Linson); id. at 18:9-12 (Linson).

27.     Instead of stopping after Landarazo engaged his emergency equipment, the SUV kept driving slowly and swerving side to side.   See Tr. at 18:15-20 (Linson).

28.     When Aranda-Diaz failed to stop, Linson pulled up closer to Aranda-Diaz' SUV.

-5-

<u>See</u> Tr. at 18:15-20 (Linson).

29.    Linson and Landarazo observed Aranda-Diaz inside the SUV fumbling with something while driving the SUV.  <u>See</u> Tr. at 18:21-22 (Linson).

30.    Aranda-Diaz drove for approximately two blocks after Landarazo engaged his emergency equipment.  <u>See</u> Tr. at 19:3-4 (Linson).

31.    The SUV came to a stop south of the intersection of 12th Street and Menaul.  <u>See</u> Plaintiff's Exhibit 2, Hand-drawn diagram; Tr. at 19:3-4 (Linson).

32.    After the SUV came to a stop, Linson, who was driving behind Landarazo, stopped his unmarked car, exited it, and approached Aranda-Diaz in the SUV.  <u>See</u> Tr. at 19:21-24 (Linson).

33.    Linson identified himself as an Albuquerque police officer and asked Aranda-Diaz for his license, registration, and insurance.  <u>See</u> Tr. at 20:1-3 (Linson); <u>id.</u> at 39:5-6 (Linson).

34.    Linson observed that Aranda-Diaz was hot and sweaty, and behaving in an excited manner.  <u>See</u> Tr. at 20:4 (Linson).

35.    Aranda-Diaz did not have any identifying documents, license, or registration.  <u>See</u> Tr. at 22:10-14 (Cairns, Linson).

36.    It is unlawful in New Mexico to drive without license, registration, and proof of insurance.  <u>See</u> Tr. at 22:15-25 (Cairns, Linson).

37.    Aranda-Diaz initially gave a false identity.  <u>See</u> Tr. at 42:22-23 (Linson).

38.    Linson observed pieces of a white substance on the front of Aranda-Diaz' shirt and around Aranda-Diaz' mouth.  <u>See</u> Tr. at 20:5-7 (Linson).

39.    Based on his training and experience, Linson knew that the white substance appeared to be crack cocaine.  <u>See</u> Tr. at 20:18-24 (Linson).

40.    Linson asked Aranda-Diaz to exit the SUV.  <u>See</u> Tr. at 20:12-13 (Linson).

41.     Linson removed a piece of the white substance from the front of Aranda-Diaz' shirt. See Tr. at 20:12-17 (Linson).

42.     Linson asked Aranda-Diaz to wait beside the SUV.  See Tr. at 20:15-17 (Linson).

43.     Linson returned to his car where he removed a field-test kit.  See Tr. at 21:13-14 (Cairns, Linson).

44.     Linson placed the white substance from Aranda-Diaz' shirt in one of the vials from the kit with chemicals that react with controlled substances.  See id. at 21:2-7 (Linson).

45.     The white substance tested positive for the presence of cocaine.  See Tr. at 21:15-16 (Cairns, Linson).

46.     After the field test detected cocaine, Linson took Aranda-Diaz into custody, placed him under arrest, and removed the remaining pieces of white substance from Aranda-Diaz' chest area.  See Tr. at 21:20-22 (Linson).

47.     Aranda-Diaz was placed in handcuffs and was standing next to the SUV.  See Tr. at 40:6-7 (Linson).

48.     Linson arrested Aranda-Diaz for drug possession.  See Tr. at 41:13-14 (Linson).

49.     After the arrest, Linson tried to determine who Aranda-Diaz was.  See Tr. at 42:20-43:6 (Linson).

50.     After the officers arrested Aranda-Diaz, they determined that they were going to have the SUV towed.  See Tr. at 41:13-15 (Linson).

51.     Because the SUV was going to be towed, the officers performed an inventory search of the vehicle.  See Tr. at 41:16-18 (Linson).

52.     Linson did not expect to find a large quantity of narcotics in the vehicle, because he believed at the time that Aranda-Diaz had probably swallowed much of the drugs he might have had

-7-

in the car with him.  See Tr. at 26:19-23 (Linson).

53.     Aranda-Diaz did not consent to the search of his SUV and told the officers that they would need a warrant to search his SUV.  See Tr. at 50:25-51:4 (Gandert, Linson).

54.     The officers searched the SUV and found more of the white substance in the cup holder adjacent to the driver's-side seat.  See Tr. at 23:5-9 (Linson); id. at 24:4-6 (Linson).

55.     Those pieces of white substance also tested positive in the field-test kit for the presence of cocaine.  See Tr. at 23:11-13 (Linson).

56.     Another Albuquerque police officer, Detective Wolf, arrived and assisted Linson and Landarazo.  See id. at 23:22-24 (Linson).

57.     Using his flashlight, Wolf observed that the driver's side power-window switch in the SUV was loose and was hanging to the side of the arm rest.  See Tr. at 24:19-25:1 (Linson, Cairns).

58.     Wolf observed that the switch was hanging by the wires, and that, by looking directly down the hole next to the loose switch, he could see a large bag.  See Tr. at 25:5-9 (Linson).[3]

59.     Wolf observed a golf-ball sized package of white substance and a firearm inside the driver's-side door panel.  See Tr. at 25:5-9 (Linson); id. at 25:21-24 (Linson).

60.     Wolf removed these items from the SUV.  See id. at 25:22-24 (Linson).

61.     The white substance from the bag found inside the driver's-side door panel tested

---

[3] Aranda-Diaz stated in his briefing that he disputed that the bag was visible without dismantling the door.  Instead, he argues that the officers had to take apart the door to find the evidence.  Aranda-Diaz, however, did not put on any evidence to dispute Linson's version of the facts.  Moreover, Aranda-Diaz did not create any genuine reason to disbelieve Linson's testimony about the door.  The Court finds Linson's testimony about the door to be credible.  Linson's testimony has been consistent and believable.  The Court therefore credits Linson's testimony about the door.

positively for cocaine.  Tr. at 25:25-26:3 (Cairns, Linson).

62.     Aranda-Diaz was not cited for running a red light.  See Tr. at 38:11-13 (Gandert, Linson).

## PROCEDURAL BACKGROUND

A federal grand jury indicted Aranda-Diaz on charges of illegally re-entering the United States after deportation, possessing the cocaine with intent to distribute it, possessing a firearm in furtherance of a drug-trafficking crime, being a felon in possession of a firearm, and being an illegal alien in possession of a firearm.

On January 5, 2009, Aranda-Diaz, through his counsel, submitted a motion to suppress evidence, i.e., the cocaine and firearm that were seized from his vehicle.  On February 11, 2009, the United States submitted its Amended Response to Defendant's Motion to Suppress Evidence, responding to Aranda-Duran's motion to suppress.  See Doc. 34. This amended response contains no new arguments and only corrects a few errors in the original pleading.

In his motion to suppress, Aranda-Diaz argues that the initial traffic stop and subsequent vehicle search were invalid.  Aranda-Diaz maintains that the traffic stop, which was ostensibly based on a traffic violation, was a ruse done solely to justify a pretextual arrest of Aranda-Diaz and seizure of his vehicle without reasonable suspicion or a warrant.  See Motion at 3.  As evidence that the stop was a ruse, Aranda-Diaz emphasizes that the discovery that the United States provided to Aranda-Diaz' defense counsel contains no indication that Aranda-Diaz was cited for a traffic violation.  See id.

Aranda-Diaz also contends that the officers' vehicle search was invalid.  Aranda-Diaz notes that the officers did not have a warrant to conduct the search, and that an warrantless inventory search is valid only if the search is conducted to protect the owner's property while the vehicle

remains in police custody, to protect police against disputes over lost or stolen property, or to protect law enforcement officers from potential danger.  See id. at 4.   Aranda-Diaz argues that the officers conducted an investigatory, rather than inventory search, and that search was invalid because the officers did not have a warrant.  See id. at 4-6.

The United States responds that the initial stop was valid because it was based on an observed traffic violation.  See Amended Response to Defendant's Motion to Suppress Evidence at 6, filed February 11, 2009 (Doc. 34).  The United States concedes that Linson wanted to stop Aranda-Diaz' SUV because he suspected Aranda-Diaz was selling drugs.  See id. at 6.  The United States maintains, however, that Linson's motivation for stopping the vehicle is irrelevant as long as he had observed a traffic violation for which a stop would be justified.  See id.

The United States also contends that requesting identification of a driver and running checks for warrants is lawful in a traffic stop such as the one that occurred in this case.  See id.  The United States points out that Aranda-Diaz did not have any of the documents that Linson requested.  According to the United States, the lack of required documents was alone sufficient to justify a longer investigatory detention.  See id. at 7.  The United States argues that Linson and the other officers had reasonable suspicion for the stop, and that the totality of the circumstances gave Linson reasonable suspicion and probable cause that Aranda-Diaz possessed cocaine.  See id. at 8-9.

The United States argues that the crack cocaine was in plain view, hanging in chunks from Aranda-Diaz' shirt.  Based on the recognizable contraband being in plain view, the United States argues that Linson had probable cause to conduct a search.  See id. at 10.  The United States also contends that, after the substance on Aranda-Diaz' shirt tested positive for cocaine, the officers had probable cause to search Aranda-Diaz' SUV.  See id. at 11.  Finally, the United States contends that the search was conducted incident to a lawful arrest.  See id. at 12.

In reply, Aranda-Diaz argues that, even if the officers had reason to search the vehicle, it was not proper for them to dismantle the door panel to look for contraband after Arand-Diaz had been handcuffed and arrested. <u>See</u> Defendant's Reply to Government's Response to Motion to Suppress Evidence at 4, filed March 2, 2009 (Doc. 38)("Reply"). Aranda-Diaz argues that the organizing principle for cases discussing searching a vehicle incident to an arrest is that areas reachable by an occupant without exiting the automobile may be searched incident to arrest, but an area that is outside any occupant's reach or that can be reached only through an elaborate dismantling of the vehicle may not be searched. <u>See</u> <u>id.</u>

At the suppression hearing, Aranda-Diaz argued that, even if probable cause supported the vehicle search, the officers should have obtained a warrant to search the hole in the drivers' side door. <u>See</u> Tr. at 55:2-7 (Gandert). Aranda-Diaz conceded, however, that Linson's testimony was that the hole was visible without any need to dismantle the door lock. <u>See</u> <u>id.</u> at 55:11-12 (Gandert). The United States countered that a proper search incident to a lawful arrest can extend to areas within reach of the driver in a vehicle's interior. <u>See</u> <u>id.</u> at 62:5-10 (Cairns). According to the United States, the hole in the door panel was within reach because it was directly below the armrest on the driver's side door. <u>See</u> <u>id.</u>

The Court asked Aranda-Diaz' attorney if he believed there was a Fourth-Amendment violation when Linson took a sample of cocaine from Aranda-Diaz' shirt. <u>See</u> Tr. at 72:16-21 (Court). Mr. Gandert conceded that he did not believe such activity amounted to a constitutional violation. <u>See</u> <u>id.</u> at 72:22. Mr. Gandert admitted that the cocaine "was in plain view, unfortunately." <u>See</u> <u>id.</u> at 72:23. Mr. Gandert also conceded that, after the substance from Aranda-Diaz' shirt tested positive for cocaine, Linson had probable cause to arrest Aranda-Diaz. <u>See</u> <u>id.</u> at 73:10-15 (Court, Gandert).

## RELEVANT FOURTH AMENDMENT LAW

The Fourth Amendment protects a person's right to be secure against unreasonable seizure. The hallmark of the Fourth Amendment is reasonableness.  Accordingly, for Fourth-Amendment purposes, there are three categories of police/citizen encounters: (i) consensual or voluntary encounters; (ii) Terry stops or analogous investigative detentions; and (iii) arrests.  See United States v. Griffin, 7 F.3d 1512, 1516 (10th Cir. 1993).  What the police may do turns on the category of encounter.

### 1.      Consensual Encounters.

Consensual encounters are "characterized by the voluntary cooperation of a citizen in response to noncoercive questioning."  United States v. Griffin, 7 F.3d at 1516.  Such encounters do not implicate the Fourth Amendment.  See Florida v. Bostick, 501 U.S. 429, 434 (1991)("The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature.").  A police/citizen encounter remains consensual "[s]o long as a reasonable person would feel free 'to disregard the police and go about his business . . . .'"  Florida v. Bostick, 501 U.S. at 434  (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)).  "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."  Terry v. Ohio, 392 U.S. 1, 20 (1968).

The United States Court of Appeals for the Tenth Circuit has held that "the stopping of a vehicle constitutes a 'seizure.'"  United States v. Orrego-Fernandez, 78 F.3d 1497, 1503 (10th Cir. 1996)(quoting United States v. Walker, 933 F.2d 812, 815 (10th Cir. 1991), cert. denied, 502 U.S. 1093 . . . (1992)).  Thus, "[a] routine traffic stop is a seizure under the Fourth Amendment."  United States v. West, 219 F.3d 1171, 1176 (2000).

2.      **Investigative Detention.**

In <u>Terry v. Ohio</u>, the Supreme Court of the United States held that a police officer can temporarily detain an individual suspected of criminal activity if the officer can point to specific, articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the intrusion.  <u>See</u> 392 U.S. at 21.  The officer's stop or seizure of a person must be based on reasonable suspicion, which can be supported by specific articulable facts, that the person was involved in wrongdoing.  <u>See</u> <u>id.</u>

Officers may ask the person questions during the <u>Terry</u> stop to dispel or confirm the officers' suspicions that a law is being violated.  <u>See</u> <u>Florida v. Royer</u>, 460 U.S. 491, 498 (1983); <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 881-82 (1975).  The detainee, however, is not obliged to respond.  <u>See</u> <u>Berkemer v. McCarty</u>, 468 U.S. 420, 439 (1984)(stating that "the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released.").  A police/citizen encounter that goes beyond the limits of a <u>Terry</u> stop is an arrest which must be supported by probable cause or consent to be valid.  <u>See</u> <u>United States v. Perdue</u>, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a <u>Terry</u> stop, however, may be constitutionally justified only by probable cause or consent.").

An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger."  <u>Terry v. Ohio</u>, 392 U.S. at 27.  "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  <u>Id.</u>  A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other

hidden instruments for the assault of the police officer." Id. at 29.  In evaluating the validity of the stop-and-frisk, the totality of the circumstances must be considered.  See Florida v. Bostick, 501 U.S. 429, 436 (1991).

These stop-and-frisk principles apply with equal weight to motorists and to pedestrians. Michigan v. Long, 463 U.S. 1032, 1050-51 (1983).  The Tenth Circuit has adopted the Terry doctrine for an investigative detention – "stop" –  and for a protective search –  "frisk."  United States v. King, 990 F.2d 1552, 1557 (10th Cir. 1997)("Terry has come to stand for two distinct propositions – an investigative detention ('stop') in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, . . . and a protective search ('frisk') which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.")(internal citations omitted). The legal standard is whether a "stop and frisk" is reasonable under the Fourth Amendment.  United States v. King, 990 F.2d at 1557.

The court must conduct a two-part inquiry to determine whether an investigative detention is reasonable under the Fourth Amendment.  See United States v. King, 990 F.2d at 1557.

> To determine whether an investigative detention or a protective search is reasonable under the Fourth Amendment, the inquiry is twofold.  First, the officer's action must be justified at its inception. . . .  For an investigative detention, the officer must have an articulable and reasonable suspicion that the person detained is engaged in criminal activity. . . .  For a protective search to be "justified at its inception," the officer must not only harbor an articulable and reasonable suspicion that the person is armed and dangerous, the officer must also be entitled to make a forcible stop.
>
> The second prong of the reasonableness inquiry of either an investigative detention or a protective search is whether the officer's action is reasonably related in scope to the circumstances which justified the interference in the first place.

United States v. King, 990 F.2d at 1557 (internal citations and quotation marks omitted).

Neither "inarticulate hunches," nor "inchoate and unparticularized suspicion," will suffice

to justify an investigatory detention.  Terry v. Ohio, 392 U.S. at 22, 27.  In determining the reasonableness of an investigation detention, however, "'common sense and ordinary human experience must govern over rigid criteria.'"  United States v. Walraven, 892 F.2d 972, 975 (10th Cir. 1989)(quoting United States v. Sharpe, 470 U.S. 675, 685 (1985)).   An investigative detention may be unreasonable when it is a more serious intrusion on one's liberty than is allowable on the mere suspicion of criminal activity.  See United States v. King, 990 F.2d at 1557.

In United States v. Johnson, 364 F.3d 1185 (10th Cir. 2004), the Tenth Circuit held that an officer had reasonable suspicion to continue questioning and to frisk a suspect after: (i) the officer had responded to a call from a citizen who gave his phone number, and gave a detailed and accurate description of possible criminal activity and of the suspect; (ii) the contact occurred in Albuquerque's highest-crime area; (iii) and the suspect displayed nervous behavior.  See id. at 1194. The Tenth Circuit noted that the officer's experience and training allowed him to make inferences, based on a combination of the surrounding circumstances, that criminal activity was afoot.  See id. ("His suspicions were particularized to [the suspect], and were based on how his training and experience taught him to interpret a number of objectively reasonable details.").  While many of the factors that the Tenth Circuit considered did not, without more, give rise to reasonable suspicion, the combination of circumstances was sufficient.  See id. at 1193 (noting that the district court had erred because "[a]ll of these factors, mitigating and aggravating, should have been analyzed as part of the totality of the circumstances faced by [the officer] at the inception of the detention").

The Tenth Circuit has held that "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."   United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995). See  United States v. Soto, 988 F.2d 1548, 1554

(10th Cir. 1993)("A traffic stop is an investigative detention analogous to a <u>Terry</u> stop, in that, although probable cause is not required, the detaining officer must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring before stopping the automobile.").  "It is also irrelevant that the officer may have had other subjective motives for stopping the vehicle. Our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction." <u>United States v. Botero-Ospina</u>, 71 F.3d at 787 (quoting <u>Delaware v. Prouse</u>, 440 U.S. 648, 661 (1979).

"During a routine traffic stop, the detaining officer may request a driver's license and vehicle registration, run a computer check on the car and driver, and issue a citation." <u>United States v. Soto</u>, 988 F.2d at 1554.  "If the officer wishes to detain the driver for further questioning unrelated to the initial stop, the officer must have an objectively reasonable articulable suspicion that illegal activity has occurred or is occurring." <u>United States v. Soto</u>, 988 F.2d at 1554.

> **3.** <u>**Warrantless Arrests.**</u>

Under certain circumstances, a police officer may lawfully arrest an individual without an arrest warrant, including when the officer witnesses an individual commit an offense in the officer's presence.  In <u>United States v. Watson</u>, 423 U.S. 411 (1976), the Supreme Court stated:

> The cases construing the Fourth Amendment thus reflect the ancient common-law rule that a peace officer was permitted to arrest without a warrant for a misdemeanor or felony committed in his presence as well as for a felony not committed in his presence if there was reasonable ground for making the arrest.

423 U.S. at 418.  <u>See</u> <u>Romero v. Fay</u>, 45 F.3d 1472, 1476 (10th Cir. 1995)("A police officer may arrest a person without a warrant if he has probable cause to believe that person committed a crime.").  Thus, to protect the Fourth Amendment's right to be free from unreasonable seizure,

-16-

probable cause must support formal arrests or seizures that resemble formal arrests.  See Michigan v. Summers, 452 U.S. 692, 700 (1981)(stating that "every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause.").

Probable cause to arrest means a police officer has a reasonable belief that the person arrested has committed or is committing a crime.  As the Supreme Court explained in  Wong Sun v. United States, 371 U.S. 471 (1963):

> It is basic that an arrest with or without a warrant must stand upon firmer ground than mere suspicion . . .  though the arresting officer need not have in hand evidence which would suffice to convict. The quantum of information which constitutes probable cause – evidence which would warrant a man of reasonable caution in the belief that a felony has been committed [ – ] . . . must be measured by the facts of the particular case.

Id. at 479 (internal citations omitted).

> The crucial question for us then is whether knowledge of the related facts and circumstances gave the officer "probable cause" within the meaning of the Fourth Amendment, and "reasonable grounds" . . . to believe that petitioner had committed or was committing a violation of the narcotic laws. If it did, the arrest, though without a warrant was lawful and the subsequent search of petitioner's person and the seizure of the found heroin were validly made incident to a lawful arrest, and therefore the motion to suppress was properly overruled and the heroin was competently received in evidence at the trial.

Draper v. United States, 358 U.S. 307, 310-11 (1959).  See United States v. Valenzuela, 365 F.3d 892, 896 (10th Cir. 2004)(stating that probable cause to arrest exists when facts and circumstances within an officer's knowledge are sufficient to warrant a man of reasonable caution to believe that an offense has been or is being committed).  "Probable cause to arrest exists only when the facts and circumstances within the officer's knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."  United States v. Valenzuela, 365 F.3d at 896 (10th Cir. 2004)(internal quotation marks omitted).

-17-

4.      **The Exclusionary Rule.**

When law enforcement officers obtain evidence in violation of the Constitution, the exclusionary rule generally precludes its use in a criminal prosecution against the victim of the illegal seizure.  See Illinois v. Krull, 480 U.S. 340,  347 (1987)(citing Weeks v. United States, 232 U.S. 383 (1914)).  The exclusionary remedy extends not only to the primary evidence obtained from the illegal seizure, but also to the indirect product of the seizure, the secondary evidence, or the "fruit of the poisonous tree."  Nardone v. United States, 308 U.S. 338, 341(1913).

Evidence is not considered

fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

Wong Sun v. United States, 371 U.S. at 487-88.  "To suppress evidence as the fruit of [an] unlawful detention, [the defendant] must make two showings: [i] that the detention did violate his Fourth Amendment rights; and [ii] that there is a factual nexus between the illegality and the challenged evidence."  United States v. DeLuca, 269 F.3d 1128, 1132 (10th Cir. 2001)(internal quotations omitted).  Once the defendant has made those showings, then the government must prove that the evidence the defendant seeks to suppress "is not fruit of the poisonous tree, either by demonstrating that the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." Id. (internal quotations omitted).  A defendant must at least show that "the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct."  Id. (internal quotations omitted).

Once the defendant has shown a causal connection between the illegal seizure and the

-18-

specific evidence alleged to be the fruit of the seizure, the government has the burden of persuasion of showing that the evidence is admissible because it was obtained by means sufficiently distinguishable to be purged of the primary taint.  See Brown v. Illinois, 422 U.S. 590, 602-604 (1975); Wong Sun v. United States, 371 U.S. at 488.  Even "the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality."  New York v. Harris, 495 U.S. 14, 19 (1990).

## ANALYSIS

Aranda-Diaz challenges the validity of the initial traffic stop and of the search that was conducted on his vehicle.  The Court finds, however, that Linson instigated a lawful traffic stopped based on an observed traffic violation.  The totality of the circumstances also gave Linson probable cause to extend Aranda-Diaz' detention after Linson observed in plain view a substance which his training and experience caused him to conclude contained crack cocaine.  Moreover, Aranda-Diaz' failure to produce any identifying documents, license, registration, or proof of insurance justified the extended detention.  Once the substance that was in plain view tested positive for cocaine, Linson had probable cause to arrest Aranda-Diaz.  When the arrest was lawfully made, Linson and the other officers lawfully searched Aranda-Diaz' vehicle.  Because the stop and the search were lawful, the evidence that the officers seized at the scene is admissible.  The Court will therefore deny the motion to suppress.

## I.    THE INITIAL TRAFFIC STOP WAS LAWFUL.

Aranda-Diaz' primary argument against the validity of the traffic stop is that the stop for a traffic violation was illegal because it was pretextual.  The United States concedes that Linson desired an opportunity to further investigate Aranda-Diaz after observing the suspicious activity in the grocery parking lot.  The United States contends, however, that Linson's motive is irrelevant as

long as the stop is based on the observation of a traffic violation.  The Court agrees with the United

States and finds that, even if Linson had an underlying motive to further investigate possible

narcotics activity, the traffic violation that he observed justified a stop.

"[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed

traffic violation or if the police officer has reasonable articulable suspicion that a traffic or

equipment violation has occurred or is occurring."  United States v. Botero-Ospina, 71 F.3d at 787.

After Aranda-Diaz left the grocery parking lot in his SUV, Linson followed him for several blocks.

During that time, Aranda-Diaz reached a red light and, instead of stopping, turned right and

proceeded through the red light.  See Tr. at 15:20-24 (Linson).  Aranda-Diaz stated in his Reply that

he disputed the contention that he ran through the red light, see Reply at 1, but he did not offer any

evidence at the suppression hearing to contradict the statement.  Nor did Aranda-Diaz adduce

anything from Linson's testimony on the issue that would call into question its truthfulness or

accuracy.  Linson's narrative on that fact is credible, and the Court has no good or sound reason to

disbelieve it.

Linson is authorized to enforce the City of Albuquerque's traffic code, see Tr. at 5:2-5

(Cairns, Linson), which states:

> Whenever traffic is controlled by traffic control signals exhibiting colored lights or
> colored lighted arrows, successively one at a time, or in combination, only the colors
> green, yellow and red shall be used, except for special pedestrians control signals
> carrying a word legend and the lights indicate and apply to drivers of vehicles and
> pedestrians.
>
> * * * *
>
> (E)     Steady Red.
>
>     (1) Vehicular traffic facing the signal shall stop before entering the
>     crosswalk, on the near side of the intersection, or if there is no
>     crosswalk, then before entering the intersection shall remain standing

> until green is shown.  However, if there is no sign prohibiting a right turn on a red light, such vehicle may turn right into the nearest right lane as practicable *after standing until the intersection may be entered safely*, provided that such vehicle shall yield the right-of-way to all pedestrians, bicycles and other vehicles lawfully in or approaching the intersection.

City of Albuquerque Traffic Code § 8-2-2-2 (emphasis added).  Under this section, drivers are required to stop before turning right on a red light.  The conduct Linson observed therefore constituted a traffic violation and justified the initial stop.  See United States v. Botero-Ospina, 71 F.3d at 787.

"It is also irrelevant that the officer may have had other subjective motives for stopping the vehicle. [The Court's] sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction." United States v. Botero-Ospina, 71 F.3d at 787 (quoting Delaware v. Prouse, 440 U.S. at 661)).  At the suppression hearing, Aranda-Diaz elicited testimony from Linson regarding the frequency with which Linson engages in traffic enforcement or issues traffic citation.  See Tr. 33:20-34:14 (Gandert, Linson).  The standard announced in United States v. Botero-Ospina for traffic stops, however, "ensures that the validity of traffic stops 'is not subject to the vagaries of police departments' policies and procedures concerning the kinds of traffic offenses of which they ordinarily do or do not take note.'"  United States v. Botero-Ospina, 71 F.3d at 788 (quoting United States v. Ferguson, 8 F.3d 385, 388-92 (6th Cir. 1993)).

Before United States v. Botero-Ospina, the Tenth Circuit evaluated pretextual stops according to the test set forth in United States v. Guzman, under which a court would ask "'whether under the same circumstances a reasonable officer would have made the stop in the absence of the invalid purpose.'"  864 F.2d 1512 (10th Cir.1988) (quoting United States v. Smith, 799 F.2d 704,

709 (11th Cir. 1986)).  Under <u>United States v. Guzman</u>, officers could not constitutionally use a minor traffic infraction to justify a stop an individual to investigate a hunch that the individual was engaged in other illegal activity if a reasonable officer under the same circumstances would not have made the stop in the absence of the invalid purpose.  See <u>United States v. Botero-Ospina</u>, 71 F.3d at 786.

The Tenth Circuit in <u>United States v. Botero-Ospina</u> abandoned the approach from <u>United States v. Guzman</u> and adopted the current standard, reasoning:

> This new standard more effectively promotes an objective assessment of police officers' actions, as required by the Supreme Court.  See <u>Maryland v. Macon</u>, 472 U.S. 463, 470 . . . (1985); <u>Scott v. United States</u>, 436 U.S. 128, 138 . . . .  It eliminates the confusion and inconsistencies inherent in the application of the <u>Guzman</u> standard, and ensures that the validity of traffic stops "is not subject to the vagaries of police departments' policies and procedures concerning the kinds of traffic offenses of which they ordinarily do or do not take note."  <u>Ferguson</u>, 8 F.3d at 392.  Finally, and significantly, by abandoning the <u>Guzman</u> standard for pretext, we rightly leave to the state legislatures the task of determining what the traffic laws ought to be, and how those laws ought to be enforced.

<u>United States v. Botero-Ospina</u>, 71 F.3d at 787-88.  Under the standard from <u>United States v. Botero-Ospina</u>, the frequency with which Linson makes traffic stops or issues citations is not relevant to the validity of the stop.  Moreover, Linson's ulterior motive to investigate other illegal activity is not alone sufficient to invalidate a traffic stop based on an observed traffic violation.  Rather, under the circumstances, Linson was justified in pulling Aranda-Diaz over after observing the red-light violation.

## II.     THE TOTALITY OF THE CIRCUMSTANCES GAVE LINSON PROBABLE CAUSE TO EXTEND THE DETENTION.

Even where an initial traffic stop is valid, "[i]f the officer wishes to detain the driver for further questioning unrelated to the initial stop, the officer must have an objectively reasonable articulable suspicion that illegal activity has occurred or is occurring."  <u>United States v. Soto</u>, 988

F.2d at 1554.  The Court believes that, during and immediately following the stop, Linson made various observations which, combined with what he had seen earlier in the John Brook's parking lot, lead him to reasonably conclude that illegal activity unrelated to the red-light violation had occurred.  Linson was therefore justified in extending the detention to further investigate.

When Landarazo first engaged his emergency equipment in an attempt to stop Aranda-Diaz, Aranda-Diaz did not pull over.  See Tr. at 17:5-12 (Linson).  Instead, Aranda-Diaz began fumbling with something inside the SUV while continuing to drive in front of Landarazo.  See id. at 18:21-22 (Linson).  After Aranda-Diaz finally came to a stop, Linson immediately approached him and asked for his identification, registration, and proof of insurance.  Linson was entitled to ask for such documentation as part of the traffic stop.  See United States v. Soto, 988 F.2d at 1554 ("During a routine traffic stop, the detaining officer may request a driver's license and vehicle registration, run a computer check on the car and driver, and issue a citation.").  Under New Mexico law, drivers are required to produce a signed registration document "upon demand of any police officer."  NMSA 1978 § 66-1-13.  Any person operating a motor vehicle in New Mexico must also "have his driver's license in his immediate possession at all times when operating a motor vehicle and shall display the license upon demand of a magistrate, a peace officer or a field deputy or inspector of the division."  NMSA 1978 § 66-5-16.  Aranda-Diaz' failure to produce the requested documents was a violation of New Mexico law.  Moreover, Aranda-Diaz offered no documents that would identify him.  Linson was therefore justified in detaining Aranda-Diaz to question him and try to ascertain his identity.

Linson also had reasonable suspicion to question Aranda-Diaz based on the events that transpired beginning with the transactions that Linson observed in the grocery parking lot.  Based on his training and experience as a narcotics officer, Linson recognized various factors from which

-23-

he could form the basis of reasonable suspicion.  First, Linson noted that Aranda-Diaz and the other individuals were parked on an unlit side of the grocery store and did not enter the store at any point in time.  See Tr. at 6:17-7:5 (Linson); id. at 7:14-15.  Aranda-Diaz' behavior in running between the different vehicles, making hand-to-hand transactions, and stuffing something into his sock before driving away indicated possible narcotics activity.  While Linson may not have felt this activity alone gave him sufficient justification to approach Aranda-Diaz, such behavior provided context to the circumstances as they later developed.

Once Landarazo attempted to pull Aranda-Diaz over, Linson observed Aranda-Diaz fumbling in his car with something while failing to come to a stop.  Thus, by the time Linson discovered that Aranda-Diaz had no license, registration, insurance, or other identification, Aranda-Diaz had already acted in a manner that would raise reasonable suspicion of criminal activity.  At that point, Linson saw the substance on Aranda-Diaz' mouth and chest that, based on Linson's training and experience, appeared to be crack cocaine.  See Tr. at 20:5-7 (Linson).  All of these facts – the transactions in the parking lot, the apparent attempts to conceal something before stopping for Landarazo, the failure to produce identifying documents, and the appearance of a substance that appeared to be an illegal substance – contributed to the totality of circumstances under which Linson had at least reasonable suspicion that Aranda-Diaz was engaged in criminal activity.  Linson was therefore justified in asking Aranda Diaz to exit the vehicle and subjecting him to further questioning about his identity.

Moreover, Linson had reasonable suspicion to remove a portion of the material that appeared to be crack cocaine from Aranda-Diaz' shirt for testing.  The substance was in plain view, and had the appearance, based on Linson's training and experience as a narcotics officer, to be cocaine.  See Tr. at 20:18-24 (Linson).  "Pursuant to the plain view doctrine, if police are lawfully in a position

from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." United States v. Holmes, 311 Fed.Appx. 156, 160 (10th Cir. 2009). Because the incriminating nature of the substance was immediately apparent to Linson, a trained and experienced undercover narcotics officer, he needed no warrant to remove the substance from Aranda-Diaz' shirt. Aranda-Diaz admitted as much at the hearing and conceded that the substance on his shirt was in plain view and that Linson did not violate the Constitution by removing a portion for testing. See Tr. at 72:21-23 (Gandert).

In sum, the Court believes that, based on the totality of the circumstances, none of Linson's conduct leading up to requiring Aranda-Diaz to exit the SUV and removing a piece of the white substance from Aranda-Diaz' chest for testing ran afoul of Aranda-Diaz' constitutional rights.

## III.    LINSON AND THE OTHER OFFICERS HAD PROBABLE CAUSE TO SEARCH ARANDA-DIAZ' VEHICLE.

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967) (footnote omitted). One of the recognized exceptions to the warrant requirement is a search incident to a lawful arrest. See Arizona v. Gant, 129 S.Ct. 1710, 1723-24 (2009). The Supreme Court has recently clarified when police officers may search a vehicle incident to a lawful arrest. Accordingly, "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." Id.  It was lawful for Linson to arrest Aranda-Diaz for drug possession. The surrounding facts and circumstances also made it reasonable

for Linson and the other officers to believe the SUV Aranda-Diaz was driving contained evidence

of the offense of arrest.  Thus, although Linson and the other officers did not have a warrant, the

search that they conducted of the SUV incident to Aranda-Diaz' arrest was lawful.

### A.   THE ARREST WAS LAWFUL.

The first inquiry in evaluating the legality of a search incident to a lawful arrest is whether

the arrest was lawful.  See United States v. Rollins, 190 Fed.Appx. 739, 743 (10th Cir. 2006)("The

inquiry into the propriety of a search incident to arrest is a dual one.  First, we ask whether the arrest

was in fact lawful.")(citing United States v. Anchondo, 156 F.3d 1043, 1045 (10th Cir. 1998)).

"Probable cause to arrest exists when an officer has learned of facts and circumstances through

reasonably trustworthy information that would lead a reasonable person to believe that an offense

has been or is being committed by the person arrested."  United States v. Anchondo, 156 F.3d 1043,

1046 (10th Cir. 1998).  As the Supreme Court explained in  Wong Sun v. United States:

> It is basic that an arrest with or without a warrant must stand upon firmer ground
> than mere suspicion . . .  though the arresting officer need not have in hand evidence
> which would suffice to convict.  The quantum of information which constitutes
> probable cause – evidence which would warrant a man of reasonable caution in the
> belief that a felony has been committed [ – ] . . . must be measured by the facts of the
> particular case.

Id. at 479 (internal citations omitted).

> The crucial question for us then is whether knowledge of the related facts and
> circumstances gave the officer "probable cause" within the meaning of the Fourth
> Amendment, and "reasonable grounds" . . . to believe that petitioner had committed
> or was committing a violation of the narcotic laws. If it did, the arrest, though
> without a warrant was lawful and the subsequent search of petitioner's person and the
> seizure of the found heroin were validly made incident to a lawful arrest, and
> therefore the motion to suppress was properly overruled and the heroin was
> competently received in evidence at the trial.

Draper v. United States, 358 U.S. 307, 310-11 (1959).

Linson ultimately arrested Aranda-Diaz for drug possession.  See Tr. at 41:13-14

(Linson)("Once there was a positive reaction for cocaine, he was placed in custody and under arrest for possession."). Linson had various facts to consider making the decision to arrest Aranda-Diaz. The primary basis for the arrest was the result of the field test that has performed on the substance Linson observed around Aranda-Diaz' mouth and chest area. The field test revealed that the substance contained cocaine. See Tr. at 21:15-16 (Cairns, Linson). The substance was in plain view, and based on his training and experience, Linson knew that the white substance appeared to be crack cocaine. See Tr. at 20:18-24 (Linson). The test results vindicated Linson's initial reaction. The positive result for cocaine was sufficient to support the arrest. The existence on Aranda-Diaz' person of a substance containing cocaine provided, at a minimum, a reasonable believe that Aranda-Diaz had committed or was committing a drug-trafficking crime. The arrest was therefore lawful.

## B. THERE WAS REASON TO BELIEVE THAT THE SUV CONTAINED EVIDENCE OF THE OFFENSE OF ARREST.

The Supreme Court has held that "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." Arizona v. Gant, 129 S.Ct. at 1719. The offense of arrest in this case was drug possession. While the arrest was based on the substance Linson removed from Aranda-Diaz' chest testing positive for cocaine, the rest of the facts surrounding Aranda-Diaz' encounter with law enforcement also provided Linson and the other officers with reason to believe there was drug evidence in the SUV.

Before requesting a marked police unit to carry out the stop, Linson had observed Aranda-Diaz carry out at least two hand-to-hand transactions with other individuals in an otherwise empty parking lot on the dark, unlit parking lot of a grocery store. Linson the observed Aranda-Diaz stuff something into his sock before leaving the parking lot. All of this behavior indicated to Linson that

Aranda-Diaz had engaged in a drug transaction. When Landarazo tried to stop Aranda-Diaz, Linson was able to observe Aranda-Diaz fumbling with something in the car before finally pulling over. When Aranda-Diaz' behavior, which to a reasonable person in Linson's shoes appear to be drug-related, combined with the positive field test for cocaine, Linson had reason to believe the SUV might contain more evidence of the arrested offense. Linson, for example, would have been reasonable in believing Aranda-Diaz delayed pulling over and fumbled with something in his SUV as a means of secreting incriminating evidence. Given that evidence, it was proper to search the SUV's passenger compartment and the containers within that compartment.

Aranda-Diaz contends that, even if the search of the vehicle was otherwise lawful, the officers violated the Fourth Amendment by dismantling the door to recover the bag containing more drugs and the firearm. See Reply at 4. The only testimony on point at the suppression hearing, however, established that the hole from which the large bag was recovered was open, and that the officers could see the bag without dismantling any part of the door. Linson testified that the door switch was hanging loose, by its wiring, and that it was not the officers who removed the lock from its place. Given that Linson's testimony was credible and that Aranda-Diaz offered no evidence or other basis for discrediting Linson's narrative, the Court accepts that the switch was already loose and that the officers were able to see the bag without dismantling the door.

Aranda-Diaz' argues that the hole from which the loose switch was hanging was not properly part of the scope of a search incident to an arrest because it was not within Aranda-Diaz' reach in the passenger compartment. Aranda-Diaz also noted in his reply that, at the time of writing the reply, the question was before the Supreme Court on a Writ of Certiorari whether the Fourth Amendment required police officers to demonstrate a threat to their safety or need to preserve evidence related to the crime of arrest to justify a warrantless vehicular search incident to a arrest.

See Reply at 2-3.  Approximately six weeks after Aranda-Diaz submitted his reply and three weeks after the suppression hearing, the Supreme Court ruled on the issue in Arizona v. Gant.  In some respects, the Supreme Court's decision in Arizona v. Gant cuts in Aranda-Diaz' favor, but in other ways it does not.

It is true that, according the Supreme Court's opinion in Arizona v. Gant, a vehicle search incident to arrest that is motivated by concerns for officer safety is justified only "if the arrestee is within reaching distance of the passenger compartment at the time of the search."  Arizona v. Gant, 129 S. Ct. at 1723.  Nevertheless, the Supreme Court in Arizona v. Gant also stated that officers may search a car incident to a lawful arrest when it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle."  Id. at 1724.  Under such circumstances, while the Supreme Court does not explicitly say so, it appears to follow from its opinion in Arizona v. Gant that the suspect need not be within reach of the passenger compartment because "the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein," rather than a concern for officer safety.  Id. at 1719.

In this case, it is not clear from the evidence where Aranda-Diaz was at the time Wolf spotted the loose switch and the nearby hole in which he observed the large bag containing drugs and a firearm.  Even so, the search was not based solely on officer safety.  Linson had observed Aranda-Diaz engage in an array of activities that tended to raise suspicions of drug trafficking, including hand-to-hand transactions in the back, unlit parking lot of John Brooks, an apparent attempt to hide something in the SUV before complying with Landarazo's order to pull over, presentation of a false identity, and cocaine in plain view.  Linson was therefore justified in searching the car as part of the arrest, not for safety concern, but because he had the basis for a reasonable belief that he would find evidence of the drug trafficking, which was the crime of arrest.

-29-

That includes the firearm.  Linson testified that, in his experience as a narcotics officers, individuals involved in drug trafficking frequently carried weapons.  See Tr. at 27:8-11 (Cairns, Linson).  Linson was therefore justified in searching the interior of the car, including the hole near the loose switch, which was visible, and in which the bag containing contraband could be seen with the aid of a flashlight.

The Court recognizes that a search incident to an arrest does not necessarily give police officers license to dismantle a vehicle in search of contraband.  Nevertheless, the Supreme Court has stated: "If there is probable cause to believe a vehicle contains evidence of criminal activity, United States v. Ross, 456 U.S. 798, 820-821 . . . (1982), authorizes a search of any area of the vehicle in which the evidence might be found."  Arizona v. Gant, 129 S. Ct. at 1721.  After observing Aranda-Diaz attempt to secrete something in the passenger compartment of the SUV before stopping, and after finding cocaine on Aranda-Diaz' person and around his mouth, the officers were justified in searching the passenger compartment of the SUV and shining a flashlight into the visible compartment under the loose switch.

Linson testified that the officers were conducting an inventory rather than an investigatory search.  See Tr. at 41:16-18 (Linson).  Linson testified that he did not expect to find a large quantity of narcotics in the vehicle, because he believed at the time that Aranda-Diaz had probably swallowed much of the drugs he might have had in the car with him.  See Tr. at 26:19-23 (Linson).  Thus, Linson's testimony is that the search was for inventory purposes.  The Court finds the testimony credible.  The Court agrees with the United States, however, that a lengthy discussion of the inventory search exception to the warrant requirement is unnecessary because the search of the vehicle was based on probable cause and was a properly conducted search incident to a lawful arrest.

In conclusion, the Court finds that Aranda-Diaz suffered no violation of his Fourth-

-30-

Amendment right to be free from unreasonable search and seizure.  At each point during the encounter between law enforcement officers and Aranda-Diaz, the officers conducted themselves in conformity with constitutional standards.  The initial stop was lawful, given that it was based on an observed traffic violation.  The facts and circumstances all gave Linson reasonable suspicion to continue investigating Aranda-Diaz after Aranda-Diaz failed to produce any identifying documents, registration, or proof of insurance, and after Linson observed a substance that appeared to be cocaine in plain view on Aranda-Diaz' person.  Following a positive field test result for Cocaine, Linson had probable cause to arrest Aranda-Diaz.  Finally, based on all that he had observed that night, Linson was justified in conducting a search of the passenger compartment of the vehicle.  All of the evidence seized as a result of Aranda-Diaz' encounter that night was therefore lawfully obtained. The Court therefore declines to apply the exclusionary rule to suppress that evidence.

       **IT IS ORDERED** that the Defendant's Motion to Suppress Evidence is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Gregory J. Fouratt
  United States Attorney
Norman Cairns
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Joseph W. Gandert
Federal Public Defender
Albuquerque, New Mexico

    *Attorney for the Defendant*